Exhibit B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF PAUL RUNDELL IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Paul Rundell, pursuant to section 1746 of title 28 of the United States Code hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.       I am the Chief Restructuring Officer of Prospect Medical Holdings, Inc. (together with its debtor affiliates in the above captioned chapter 11 cases as debtors and debtors in possession, the "Debtors" and, the Debtors and their non-Debtor affiliates, collectively, the "Company" or "Prospect") and a Managing Director of Alvarez & Marsal North America, LLC ("A&M"), a turnaround management consulting firm.  I have served as the Chief Restructuring Officer of the Debtors since January 11, 2025.

2.       As Chief Restructuring Officer of the Debtors, I am familiar with and knowledgeable about the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of these Chapter 11 Cases (as defined below).  I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these Chapter 11 Cases and in support of the Debtors' chapter 11 petitions and First Day Pleadings

---

[1]       A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Prospect.  The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

(as defined below) filed contemporaneously herewith.  I am authorized to submit this Declaration on behalf of the Debtors.

3.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition, or from my discussions with the Debtors' advisors.  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

4.     Beginning on January 11, 2025 (the "Petition Date"), each Debtor commenced with the United States Bankruptcy Court for the Northern District of Texas (the "Court") a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  I submit this Declaration to provide an overview of the Debtors, their businesses, and the Chapter 11 Cases, as well as to support the petitions and other motions and applications that the Debtors have filed with the Court, including the "first-day pleadings" filed contemporaneously herewith (the "First Day Motions").  I am authorized to submit this Declaration on behalf of the Debtors.

5.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees, my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition, and my discussions with Prospect's restructuring advisors (collectively, the "Advisors")—Sidley Austin LLP ("Sidley"), as counsel, Houlihan

Lokey Capital Inc. ("Houlihan Lokey"), as investment banker, and Alvarez & Marsal North America, LLC ("A&M"), as financial advisor.  If called upon to testify, I would testify to the facts set forth in this Declaration.

### Background

6.    Prospect is a significant provider of healthcare services in California, Connecticut, Pennsylvania, and Rhode Island.  The Company also owns and/or operates 16 acute and behavioral hospitals, which provide a comprehensive range of services tailored to their specific communities, including partnerships with other area hospitals, physicians, and health plans.

7.    Prospect, initially founded as Alta Hospital Systems in the mid-to-late 1990s, experienced remarkable growth in the Los Angeles area, evolving into a multi-billion-dollar healthcare system dedicated to serving underserved communities.  From approximately 2012 until 2016, the Company acquired hospital systems in Texas, Rhode Island, New Jersey, Pennsylvania, and Connecticut.[2]

8.    Prospect's financial distress started as a result of the decreased revenue and increased costs arising from the COVID-19 pandemic.  Supply issues and rising labor costs, when combined with the challenges inherent in serving economically disadvantaged populations, led to significant cost increases.  The COVID-19 pandemic also disrupted normal operations—elective procedures were postponed or cancelled, and patient volumes decreased due to lockdowns, fear of infection, and deferred elective procedures.  While outpatient visits are gradually recovering, they remain depressed compared to pre-pandemic levels, which directly impacts the Company's

---

[2]    The Company additionally opened a closed facility in Orange County, California and purchased a behavioral facility in Bellflower, California.

revenue.  Due to the COVID-19 pandemic, Prospect's hospitals reported historic volume and revenue losses, as well as skyrocketing expenses.

9.      The California hospitals however, despite these challenges, historically did and continue to, operate on a cash flow positive basis and are financially viable.  The Company's Texas and East Coast hospitals, however, continued to deteriorate.[3]  Despite concerted efforts, challenges at these hospitals persisted, mostly due to the lingering effects of the pandemic and inflation, reimbursement limitations, and shifting patient demographics.

10.      After the failure to enact operational turnarounds at its Texas and East Coast hospitals, it became clear that Prospect could no longer best serve these communities.  As a solution, in 2019, with respect to the Texas hospitals, and from 2021 through 2022, with respect to the East Coast hospitals, Prospect began a comprehensive marketing process for these assets and operations to attract willing buyers.  For the Texas hospitals, when a buyer could not be found, operations were wound down and the hospitals closed.  To avoid the same situation occurring to its East Coast hospitals, Prospect aggressively marketed its hospital assets and negotiated extensively with potential counterparties on the terms of one or more sale transactions.  These efforts resulted in three signed purchase agreements for Prospect's New Jersey, Rhode Island, and Connecticut hospitals.  The New Jersey sale successfully closed in 2021.  The Rhode Island and Connecticut purchase agreements were both signed in 2022, however, regulatory delays and ongoing litigation have delayed their closings.  The Rhode Island transaction is expected to close in Q1 2025, though the Rhode Island Attorney General and Department of Health have listed several conditions that must be satisfied prior to effectuating the closing, which Prospect and the purchaser are working to meet.  The Connecticut sale too has experienced significant delays, as

---

[3]   The marketing and ultimately winding down of the Texas hospitals occurred prior to COVID-19.

the purchaser breached the agreement and failed to close.  In addition, the purchaser filed a lawsuit against Prospect Medical Holdings, Inc. ("PMH") and certain of its Connecticut affiliates in May 2024, seeking to be relieved of its obligation to acquire the Connecticut hospitals, all as more fully set forth below.  During this time, Prospect remains liable for the cost of operating these facilities, as well as any further litigation costs in connection with the lawsuit.

11.    The Company's Pennsylvania hospitals remain a particular concern.  In the three years since the marketing and sale process for the Pennsylvania assets began, the Company received two letters of intent to acquire the Pennsylvania hospitals.  As more fully detailed below, the Attorney General's office for the Commonwealth of Pennsylvania filed suit against certain of the Debtors and their affiliates in October 2024, requesting, among other relief, the appointment of a receiver to manage the Pennsylvania hospitals.  However, Prospect has remained in close contact with the Commonwealth of Pennsylvania regarding transfer of the Pennsylvania facilities in a manner supported by the regulators.

12.    In late 2022 and 2023, Prospect required additional capital to continue operating. On May 23, 2023, certain Prospect affiliates entered into a comprehensive liability management transaction (the "2023 Transaction") with funds managed or advised by Centerbridge Credit CS, L.P. (collectively, "Centerbridge"), funds managed or advised by Blue Torch Capital L.P. (collectively, "Blue Torch"), and Medical Properties Trust, Inc. and its affiliates (collectively "MPT"), three of their largest creditors as of the Petition Date.  In exchange for the reduction of approximately $646 million in obligations owed by a number of Prospect entities to MPT, MPT received senior preferred units in PHP Holdings representing a 49% ownership interest, and a convertible promissory note, which would convert into more senior preferred units of PHP Holdings.  The 2023 Transaction infused $375 million of new capital from Centerbridge and Blue

Torch, allowing non-Debtor PHP Holdings, LLC ("PHP Holdings") to satisfy Prospect's existing

ABL obligation in the amount of approximately $200 million.[4]  PMH holds the remaining 51%

ownership interest in PHP Holdings.  PHP Holdings is the parent of the other PhysicianCo (as

defined below) entities.  As described below, PhysicianCo and its entities are not Debtors in these

Chapter 11 Cases.

13.      The 2023 Transaction proved insufficient to effectuate a turnaround of Prospect's

businesses.  Facing mounting operational losses, litigation expenses, and near-term pension plan

contribution payments, among other liabilities, Prospect needed to secure an infusion of liquidity

to continue operating as a going concern.  Therefore, Prospect embarked on the marketing and sale

of PhysicianCo (as defined herein).  In November 2023, Prospect retained Morgan Stanley & Co.

LLC to run a fulsome marketing and sale process for PhysicianCo.  After months of negotiations,

Prospect signed a purchase agreement with Astrana Health, Inc. ("Astrana") for approximately

$745 million in consideration, minus certain purchase price adjustments.  The transaction is

expected to close by the end of Q2 2025.[5]

14.      In anticipation of potential upcoming defaults under their existing financing

documents, the Debtors promptly initiated negotiations with its principal creditor, MPT, regarding

the terms of one or more potential forbearance agreements.  Contemporaneously therewith, the

Debtors commenced negotiations with other significant constituents, including the Pension Benefit

Guaranty Corporation ("PBGC").

---

[4]      The remainder of the funds were utilized to fulfill certain regulatory capital requirements for PHP Holdings, payment of fees and expenses associated with consummation of the transaction, and to allow PMH to catch up on certain outstanding accounts payables amounts.

[5]      There are a number of notices, approvals, and consents required from certain governmental authorities, including California, Rhode Island, the Drug Enforcement Administration, Arizona, and the Centers for Medicare and Medicaid Services, in order to consummate the sale to Astrana.

15.     In the face of these numerous obstacles and complications, the main catalyst of the timing of these Chapter 11 Cases was the Company's loss of liquidity.  In the months leading to the Petition Date, Prospect worked tirelessly with its management team and Advisors to secure financing sufficient to ensure a soft landing for the Company's patients and operations, which provide critical, life-saving care nationwide.  These efforts have resulted in JMB Capital Partners Lending, LLC committing to provide $100.0 million of critical new money financing to ensure Prospect's hospitals can continue to operate in the ordinary course on and after the Petition Date, and can utilize this committed financing to effectuate and orderly transition of the Company's facilities.

16.     Through the debtor-in-possession loan facility (the "<u>DIP Facility</u>")  and anticipated sales under section 363 of the Bankruptcy Code, Prospect aims to consider all transaction alternatives for the benefit of all stakeholders to these Chapter 11 Cases.

17.     To familiarize the Court with Prospect, its businesses, and the circumstances leading to these Chapter 11 Cases, this Declaration is organized into five sections.  <u>Section I</u> provides background information on Prospect's history, corporate structure, and business operations.  <u>Section II</u> describes the Debtors' capital structure.  <u>Section III</u> describes the Company's ongoing litigation and additional ongoing concerns to be addressed during the course of these proceedings.  <u>Section IV</u> describes the events leading to the commencement of the Chapter 11 Cases and the Debtors' prepetition restructuring efforts.  <u>Section V</u> summarizes the relief requested and the basis for relief in the First Day Motions filed contemporaneously herewith.

## I.      Prospect's History and Operations

### A.      History

18.     Established in the mid-to-late 1990s, Prospect's journey began as a community hospital operator in Los Angeles, focused on providing essential healthcare services to underserved

populations.  Prospect's dedication and success in Southern California led to significant growth, and Prospect is now a major provider of healthcare services in California, Connecticut, Pennsylvania, and Rhode Island.

*i)  History of Hospital Acquisitions*

19.     As of the Petition Date, the Company has 7 hospitals in California.  In February 2012, Prospect acquired Nix Health Care System, which allowed for the expansion of Prospect's operations in the state of Texas.  In June 2014, Prospect entered into a unique and innovative partnership in Rhode Island to help ensure the future of CharterCare Health Partners' two hospitals. Through a joint venture agreement, Prospect became the majority owner of CharterCARE but shares governance of the hospitals equally with CharterCARE Community Board.  Prospect further expanded its presence in the Northeast in March 2016 when it completed its acquisition of East Orange General Hospital in East Orange, New Jersey, a 212-bed general acute care hospital that has served its community for more than a century.

20.     In July 2016, Prospect acquired Crozer-Keystone Health System, based in Springfield, Pennsylvania, the largest employer and healthcare provider in Delaware County, located southwest of Philadelphia.  The Crozer-Keystone System, today called Crozer Health ("Crozer Health"), consists of four general acute care hospitals and also operates several outpatient facilities and a comprehensive physician network of primary care and specialty practices.

21.     Prospect continued its expansion in the Northeast in October 2016, when it completed its acquisition of three general acute care hospitals in Connecticut, including Eastern Connecticut Health Network ("ECHN").  Offering a full spectrum of wellness, prevention, acute care, rehabilitation, and restorative care to the community, ECHN consists of 249-bed Manchester Memorial Hospital in Manchester, Connecticut, 102-bed Rockville General hospital in Vernon, Connecticut, several outpatient facilities, and a comprehensive physician network of primary care

and specialty practices.  Also in 2016, Prospect acquired Waterbury Hospital, a 357-bed hospital which serves Waterbury and 11 surrounding communities in Western Connecticut.  Waterbury Hospital also forms the cornerstone of the Greater Waterbury Health Network, a family of healthcare-related services in the community.

22.    Prospect currently owns and operates the following 16 hospital facilities:

| Name | Location |
|------|----------|
| Los Angeles Community Hospital | Los Angeles, California |
| Southern California Hospital at Van Nuys | Van Nuys, California |
| Los Angeles Community Hospital at Norwalk | Norwalk, California |
| Southern California Hospital at Hollywood | Hollywood, California |
| Southern California Hospital at Culver City | Culver City, California |
| Foothill Regional Medical Center[6] | Tustin, California |
| Los Angeles Community Hospital at Bellflower | Bellflower, California |
| Roger Williams Medical Center | Providence, Rhode Island |
| Our Lady of Fatima Medical Center | North Providence, Rhode Island |
| Rockville General Hospital | Vernon, Connecticut |
| Manchester Memorial Hospital | Manchester, Connecticut |
| Waterbury Hospital | Waterbury, Connecticut |
| Crozer-Chester Medical Center | Chester, Pennsylvania |
| Springfield Hospital[7] | Springfield, Pennsylvania |
| Taylor Hospital | Ridley Park, Pennsylvania |
| Delaware County Memorial Hospital[8] | Drexel Hill, Pennsylvania |

---

[6]    Foothill Regional Medical Center is operated, but not directly owned, by PMH and is not a Debtor in these Chapter 11 Cases.

[7]    Due to the COVID-19 pandemic and lack of volume, Springfield Hospital was placed in suspension for all in-patient services.  The hospital does have out-patient services at this time.

[8]    The Company attempted to transition Delaware County Memorial Hospital to meet community needs by providing behavioral health services.  However, the Foundation filed suit and the state would not issue the necessary licenses for the transition.

23.     Between 2014 and 2020, as part of these various acquisitions, Prospect fulfilled
substantial capital expenditure commitments totaling approximately $420 million in Rhode Island,
Connecticut, and Pennsylvania.  In addition to these investments, Prospect made significant capital
expenditures in California, Texas, and New Jersey during the same period.  Prospect has always
sought to demonstrate a strong commitment to community welfare and improve healthcare access
and outcomes for underserved populations in the regions Prospect serves.

**B.     Business and Hospital Operations**

24.     Prospect's operations, including those conducted by non-Debtors, are structured
into three distinctive segments, each explained further below:

*i)   Hospitals*

25.     This segment encompasses the ownership and operation of acute care and
behavioral hospitals, providing a wide range of inpatient and outpatient services.  Currently, the
Company owns 16 such hospitals, each of which provide a comprehensive range of medical
services expressly tailored to the populations of their particular communities, including
partnerships with other local hospitals, physicians, and health plans.

*ii)  Medical Groups*

26.     Combined, the Company's affiliated medical groups, including the medical groups
that Prospect manages, are a significant provider of managed care services.  Each of the
Company's medical groups is a network of independent physicians that contracts with HMOs.  In
diverse areas, HMOs often find it more efficient to outsource the responsibility of providing
physician services through medical groups.  This collaboration between HMOs and medical groups
is a well-established model in the markets the Company serves and is designed to motivate
physicians to practice preventative medicine and reduce unnecessary procedures.  Affiliation with

a medical group allows independent physicians to build their practices and HMOs to more efficiently contract for physician services and outsource certain medical management and administrative functions associated with those activities.

### iii) Independent Physician Association

27.     The Independent Physician Association ("IPA") segment at Prospect Medical Group involves the management of physician services for HMO enrollees through a network of affiliated physicians.  One of the PhysicianCo non-Debtor entities, Prospect Health Plan, Inc., also holds a limited Knox-Keene licensed health plan in California, which allows it to offer comprehensive health insurance plans to its members.  Through the IPAs both employed and independent physicians join with the Debtors' health systems to contract with payers and participate in capitation, bundled payments, and other value-based payment methodologies to improve their practice environment, performance, and financial results.

### C.    Community Impact

#### i)    Community Impact

28.     Prospect's hospitals play a vital role in their communities' health and well-being and are committed to serving all patients, regardless of their ability to pay.  In California, Connecticut, Rhode Island, and Pennsylvania, the Company's hospitals are safety net hospitals, meaning they provide healthcare for individuals regardless of their insurance status or ability to pay.

#### a.    California Community Impact

29.     In California, Prospect's hospitals are members of PEACH, a statewide organization dedicated to advancing policies and programs that ensure the sustainability of California's community safety-net hospitals.  As members of PEACH, Prospect provides essential

healthcare services to underserved populations.  PEACH hospitals in California provide more than half of all safety-net hospital charity care, exceeding $400 million annually.  This support directly impacts vulnerable individuals who rely on Prospect's services.  The Company's California hospitals provided $2.9 million in charity care in fiscal year 2023.  PEACH hospitals treat 65% of inpatient behavioral health and substance abuse patients within the safety net.  PEACH hospitals' commitment to mental health services is vital for community well-being.  Prospect has 91 licensed beds for inpatient behavioral and substance abuse patients and serves 9,000 patients annually on an outpatient basis.  Prospect's hospitals are federally qualified as Disproportionate Share Hospitals ("DSH"), reflecting their integral role in meeting the healthcare needs of all Californians.

b.    Pennsylvania Community Impact

30.    In Pennsylvania, Prospect has continued to support and build off of Crozer Health's charity care initiatives.  In the 2020–2021 reporting period, Prospect Crozer provided nearly $80 million in charity care.  Since the acquisition, Prospect and Crozer Health have developed and maintained numerous wellness, health education, and community programs benefitting many people in the diverse Delaware County community and beyond.  Many Crozer Health physicians and executives hold leadership roles and board positions on a range of health organizations and nonprofit organizations throughout Delaware County.

31.    Prospect Crozer is also engaged in a variety of community outreach programs aimed to reach large groups of people and improve public health.  These programs include efforts to improve healthcare access and medical education amongst a variety of groups, including senior citizens, religious communities, students, and those suffering from housing and food insecurity.  Prospect also provides health services aimed at the entire community, such as providing close to 100,000 vaccines during the height of the pandemic and information regarding and connections to resources for safety and injury prevention.

## II.     Prospect's Prepetition Corporate and Capital Structure

### A.     Corporate Structure

32.     The Company consists of more than 100 entities organized in multiple jurisdictions. The Company is generally divided into two siloes for operational purposes:  (a) PMH and its hospital subsidiaries (collectively, "HospitalCo") and (b) PHP Holdings and its subsidiaries (collectively, "PhysicianCo").  The PhysicianCo entities are not Debtors in these Chapter 11 Cases.

33.     HospitalCo and PhysicianCo are distinct, but interrelated entities.  PMH, the parent holding company of HospitalCo, is also the 51% majority owner of PHP Holdings, the parent holding company of PhysicianCo.  Prospect Healthcare Facilities Management, LLC ("PHFM"), a wholly-owned subsidiary of PMH, is also the member-manager of PHP Holdings and manages Foothill Regional Medical Center ("FRMC").  PHFM, which manages PHP Holdings and other PhysicianCo entities, is not a Debtor in these Chapter 11 Cases.

34.     All the Debtors are direct or indirect subsidiaries of PMH.  A copy of the Company's organizational chart, showing both the Debtors (which consists of HospitalCo, with the exception of PHFM) and their non-Debtor affiliates, is attached hereto as **Exhibit A**.  In the simplified organizational chart below, the PhysicianCo, (*i.e.*, the Debtors' non-Debtor affiliates) entities are marked with a yellow background.



## B.     Board of Directors

### i.     *Prospect Medical Holdings, Inc.*

35.     The PMH Board of Directors consists of the following six directors:

| |
|---|
| Samuel Lee |
| Von Crockett |
| David Topper |
| Mitchell Lew |
| Alan Carr*[9] |
| Jeremy Rosenthal* |

36.     In connection with the Company's evaluation of strategic alternatives, on October 4, 2024 PMH created a special committee and appointed Alan Carr and Elizabeth Abrams as independent directors.  The special committee was formed with the power to, among other things, evaluate and enter into (a) strategic alternatives and (b) settlement terms and conditions

---

[9]     In this section, a name marked with an asterix denotes an independent director or manager, as applicable.

arising out of any potential claims or causes of action.  On October 21, 2024, in anticipation of executing a forbearance agreement with MPT, at MPT's demand, the special committee was disbanded.  Upon disbandment of the special committee, Elizabeth Abrams was removed as an independent director and replaced with Jeremy Rosenthal.

*ii. Prospect Healthcare Facilities Management, LLC*

37.     The PHFM Board of Directors consists of the following five managers:

| Samuel Lee |
| Von Crockett |
| Mitchell Lew |
| Alan Carr* |
| Elizabeth Abrams* |

38.     On October 4, 2024 PHFM appointed Alan Carr and Elizabeth Abrams as independent managers (the "Independent Managers") and established a special committee (the "Special Committee") to (a) evaluate and enter into (i) strategic alternatives and (ii) settlement terms and conditions arising out any potential claims or causes of action and (b) investigate and evaluate potential or actual conflicts of interest among members of the PHFM Board of Managers and the Special Committee.  The Special Committee is comprised of the Independent Managers and Mr. Crockett, as voting members.  Frank Saidara, PMH's General Counsel, is also a member of the Special Committee as a non-voting, advisory member.

**C.     Capital Structure**

39.     As of the Petition Date, the Company has approximately $2.3 billion in total funded obligations, of which approximately $1.1 billion sits at the Debtors.  This consists of approximately (a) $84 million in aggregate principal amount outstanding under the Prepetition HospitalCo Revolving Credit Facility; (b) $75 million in aggregate principal amount outstanding under the Prepetition HospitalCo Term Loan Facility; (c) $167 million in aggregate principal amount outstanding under the Prepetition HospitalCo MPT Mortgage Loan; (d) $760 million in lease

obligations under the Prepetition HospitalCo MPT Master Leases.  Non-Debtor PhysicianCo is obligated under a $453 million in aggregate principal amount outstanding under the Prepetition PhysicianCo Term Loan Facility; and there is $732 million in aggregate principal amount outstanding under the Prepetition MPT Convertible Notes, as each such facility is described and defined herein.

| Debt Facility[10] | Principal Amount Outstanding[11] | Counterparty |
|---|---|---|
| Prepetition HospitalCo MPT Master Leases[12] * | $760 million | MPT |
| Prepetition HospitalCo MPT Mortgage Loan* | $167 million | MPT |
| Prepetition HospitalCo Term Loan Facility* | $75 million | MPT |
| Prepetition HospitalCo Revolving Credit Facility* | $84 million | eCapital (as defined below) |
| Prepetition PhysicianCo Term Loan Facility** | $453 million | Centerbridge and Blue Torch |
| Prepetition MPT Convertible Notes | $732 million | MPT |
| **Total** | **$2.271 billion** | |

    *i)*    *The Prepetition HospitalCo MPT Master Leases and the Prepetition HospitalCo MPT Mortgage Loan*

40.    On August 23, 2019, certain of the Debtors entered into (i) that certain Master Lease Agreement, by and among Prospect CCMC, LLC, Prospect DCMH, LLC, Prospect Manchester Hospital, Inc., and Prospect Rockville Hospital, Inc., as lessees, and certain affiliates of Medical Properties Trust as the lessors party thereto, and (ii) that certain Master Lease

---

[10]    Debtor entities are obligors under facilities marked with an asterisk (*), and Debtor entities are guarantors, but not obligors under facilities marked with two asterisks (**).  Unmarked facilities do not implicate Debtor entities.

[11]    As of December 31, 2024.

[12]    The Debtors do not consent to the Prepetition HospitalCo MPT Master Leases being deemed true leases, nor do the Debtors waive any rights with respect to recharacterization of the Prepetition HospitalCo MPT Master Leases.

Agreement, by and among Prospect CCMC, LLC, Southern California Healthcare System, Inc., Alta Los Angeles Hospitals, Inc., and Prospect Waterbury, Inc., as lessees, and certain affiliates of Medical Properties Trust as the lessors party thereto (together, as amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition HospitalCo MPT Master Leases"), which combined account for $760 million of lease obligations.

41.     On May 23, 2023, Prospect DCMH, LLC, and Prospect CCMC, LLC, as borrowers, and certain MPT affiliates, as lenders, entered into that certain Real Estate Loan Agreement (as amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition HospitalCo MPT Mortgage Loan"), pursuant to which approximately $167 million of term loans remain outstanding.

### ii)  Prepetition HospitalCo Term Loan Facility

42.     On May 23, 2023, certain Debtors entered into that certain Loan Agreement (as amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain First Amendment to Loan Agreement dated as of June 5, 2024, the "Prepetition HospitalCo Term Loan Agreement"), by and among PMH and certain of its subsidiaries party thereto, as borrowers, the lenders from time to time party thereto, and MPT TRS Lender PMH, LLC, as administrative agent and collateral agent, which provided for (i) a $25 million term loan facility and (ii) a $50 million delayed draw term loan facility (the "Prepetition HospitalCo Term Loan Facility").   The Prepetition HospitalCo Term Loan Facility is secured by liens on substantially all assets of PMH and its hospital subsidiaries.

### iii) Prepetition HospitalCo Revolving Credit Facility

43.     On June 5, 2024, certain Debtors entered into that certain Credit and Security Agreement (as amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain First Amendment to Credit and Security Agreement, dated

as of August 16, 2024, the "<u>Prepetition Revolving Credit Agreement</u>"), by and among Southern

California Healthcare System, Inc., Alta Los Angeles Hospitals, Inc., and Alta Hospitals System,

LLC, as the borrowers, and eCapital Healthcare Corp. ("<u>eCapital</u>"), as lender, which provided for

a $90 million revolving credit facility (the "<u>Prepetition HospitalCo Revolving Credit Facility</u>").

The Prepetition HospitalCo Revolving Credit Facility is secured by liens on substantially all of the

assets and equity of the California hospitals (excluding FRMC).

### iv)  Prepetition PhysicianCo Term Loan Facility

44.     On May 23, 2023, certain non-Debtor affiliates entered into that certain Financing

Agreement (as amended and restated, supplemented, or otherwise modified from time to time,

including as amended by that certain Amendment No. 1, dated as of October 24, 2023, that certain

Amendment No. 2, dated as of November 14, 2023, that certain Amendment No. 3, dated as of

February 27, 2024, that certain Amendment No. 4, dated as of April 30, 2024, and that certain

Amendment No. 5, dated as of June 5, 2024, the "<u>Prepetition PhysicianCo Term Loan</u>"), by and

among PHP Holdings, as holdings, Prospect Intermediate Holdings, LLC, and Prospect Physician

Holdings, Inc., as borrowers, the other guarantors party thereto, the lenders from time to time party

thereto, and Wilmington Trust, National Association, as administrative agent and collateral agent,

which provided for a $375 million term loan facility that was subsequently increased by $50

million of additional term loans on November 14, 2023 (the "<u>Prepetition PhysicianCo Term Loan</u>

<u>Facility</u>").  The PhysicianCo Term Loan Facility is secured by liens on substantially all assets of

PHP Holdings and its subsidiaries, including FRMC, PMH, and the California hospitals (including

the equity of the California hospitals).

### v)  Prepetition MPT Convertible Note

45.     On May 23, 2023, PHP Holdings, LLC, executed that certain Convertible

Promissory Note for the benefit of MPT Picasso Investors TRS, LLC for approximately $732

million (the "Prepetition MPT Convertible Notes").  The Prepetition MPT Convertible Notes are secured by liens on the equity in the direct subsidiaries of PHP Holdings, which liens are subordinate to the liens under the Prepetition PhysicianCo Term Loan Facility.

## III.    Ongoing Litigation and Related Concerns

46.    ***Pennsylvania Litigation***. On October 28, 2024, the Attorney General's office for the Commonwealth of Pennsylvania filed suit against PMH, Prospect Crozer, LLC, Leonard Green and Partners, and two PMH directors (collectively the "Pennsylvania Defendants") alleging the mismanagement and neglect of Crozer Health.  The lawsuit alleges that PMH violated the terms of the purchase agreement under which PMH purchased Crozer Health, including by cutting services, closing certain facilities, and failing to fully fund pension accounts for Crozer Health retirees.  In response to these issues, the Attorney General's office has filed a civil complaint to address the management concerns and require Prospect Medical to fund operating costs until its sale to a nonprofit charitable successor.  The lawsuit also seeks a preliminary injunction to maintain existing service lines and the appointment of a receiver to manage the Crozer Health System to prevent further closures and service cuts.

47.    ***Connecticut Litigation***. In May 2024, Yale New Haven Health Services Corporation ("Yale") filed a lawsuit against PMH and certain of its Connecticut affiliates to be relieved of its obligation to acquire the Connecticut hospitals,[13] which Prospect had been relying on to strengthen its financial position.  Yale cited concerns about the financial viability of the hospitals and material adverse changes as the basis for its lawsuit.[14]  These allegations, however, are merely a pretext for Yale to justify a reduction in purchase price.  Prospect secured a pre-

---

[13]    Complaint at 2, 6, *Prospect Med. Holdings, Inc. v. Yale New Haven Health Servs. Corp.*, No. HHD-CV24-5083574-S (Conn. Super. Ct. Sept. 11, 2024).

[14]    *Id.* at 4–6.

judgment remedy against Yale, which required Yale to set aside in a separate account the full amount of the agreed-to purchase price to satisfy a potential judgment against it in connection with the counterclaims filed by Prospect.[15]  As a result of the delayed closing, Prospect continues to experience operational losses in Connecticut, and the ensuing litigation with Yale has become an additional strain on resources, requiring significant time and expense to respond to Yale's allegations.

48.     ***Other Significant Litigation.*** Litigation claims are currently pending against various Company entities that are incorporated in the following states: California, Connecticut, Delaware, New Jersey, Pennsylvania, Rhode Island, and Texas.  These claims largely fall into three categories:

  a. *Business litigation* (*e.g.*, breach of contract, unpaid invoices, unlawful retaliation, unfair business practices, defamation, misappropriation of trade secrets, lease evictions, breach of fiduciary duties, and property tax disputes);
  b. *Employment litigation* (*e.g.*, discrimination, failure to pay wages, and wrongful termination); and
  c. *Other litigation* (*e.g.*, negligence, wrongful death, and failure to properly treat or diagnose).

49.     ***Civil Investigative Demands.***

  (a)     *Department of Justice.* Two Civil Investigative Demands ("CIDs") have been served on Prospect entities by the Department of Justice ("DOJ").  On October 30, 2023 the DOJ issued a CID to PMH pursuant to the False Claims Act.  The CID alleged that PMH upcoded certain secondary diagnoses on claims for inpatient health that were submitted to federal healthcare programs.  The CID required PMH to respond within 20 days with various documentation regarding various patients and the secondary diagnoses.  An additional CID was issued to Prospect Medical Systems, LLC (PMS), a non-Debtor subsidiary of Prospect Intermediate Holdings, LLC, on May 17, 2024.  This CID was also issued under the False Claims Act, alleging that PMS submitted false diagnosis codes with the goal of increasing risk-adjusted payments under the Medicare Advantage and Med-Cal Managed Care programs.  PMS was required to send various documentation regarding their

---

[15]  Order at 3, *Prospect Med. Holdings, Inc. v. Yale New Haven Health Servs. Corp.*, No. HHD-CV24-5083574-S (X07) (Conn. Super Ct.).

contracts with Medicare and Med-Cal and their processes for determining diagnostic claims.

(b)     *Connecticut.* The Connecticut Department of Consumer Protection ("DCP") has issued two CIDs to Prospect entities. On January 11, 2024, the DCP issued a CID pursuant to the Connecticut Unfair Trade Practices Act ("CUTPA") in connection to an investigation related to a security breach of PMS's electronic files and a related allegation that PMS failed to properly safeguard patient information. The CID required Prospect entities operating in Connecticut to send in documentation related to the August 2023 cybersecurity incident by February 7, 2024. A second CID was issued to PMS on April 19, 2024 in connection to an investigation into hospital funding practices that may qualify as unfair or deceptive acts under CUPTA. The Prospect Connecticut entities were required to respond with documentation relating to the finances and funding of their entities by May 19, 2023.

50.     ***Employee Compensation Concerns.***

(a)     *401(k) Match.* The Debtors maintain a defined contribution plan for the benefit of all employees meeting the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "401(k) Savings Plan"). The 401(k) Savings Plan is primarily funded with withholdings from employee wages, though the Company also matches a percentage of an employee's contribution to the 401(k) Savings Plan. However, due to the Company's recent liquidity shortfalls, said match has been drastically underfunded in recent years, and the Debtors estimate they owe nearly $48 million with respect to the 401(k) Savings Plan. Said failure to fund the 401(K) match is considered an ERISA violation, and could result in plan disqualification by the Internal Revenue Service, which could result in severe tax consequences for both the Debtors and the plan participants.

(b)     *Employee Leave.* The Debtors' employees are eligible for certain paid time off and related benefits. I understand that as of the Petition Date, the Debtors estimate approximately $51,400,000 has accrued on the Debtors' books and records with respect to the aforementioned benefits.

51.     ***Unions***. The Debtors employ approximately 5,500 Union employees (the "Union Employees"), who have certain union-specific contributions, such as union dues and other payments, withheld from their wages (the "Union Dues"). These amounts are deducted from the Union Employees' pay and remitted by the Debtors to the appropriate unions. On average, the Debtors withhold and remit approximately $300,000 per month for Union Dues. As of the Petition Date, the Debtors estimate they are holding approximately $1,400,000 in withheld Union Dues.

52.     ***U.S. Senate Investigation and Report***.[16] On January 7, 2025, Senators Chuck
Grassley and Sheldon Whitehouse of the Bipartisan Senate Budget Committee released a report
(the "Senate Report") on their investigation on the impact of private equity firms investing in
healthcare companies.   Leonard Green & Partners, L.P. ("LGP") and its 11-year majority
ownership of Prospect was a primary focus of the investigation and subsequent report.  The Senate
Report alleges a pattern of mismanagement that prioritized shareholder investments over patient
and provider well-being.  The Senate Report alleges that while the conditions and quality of care
in Prospect's hospitals deteriorated, and the health system took on unsustainable debts and
untenable lease agreements, LGP executives took home hundreds of millions in dividends and
preferred stock redemptions.  Employees of the hospitals were rewarded for reaching certain
milestones related to the profits of the hospitals, but no similar incentives were in place for care
quality or patient health.   The Senate Report ultimately concluded that LGP's management
decisions jeopardized patient health and eroded the already precarious financial conditions at many
Prospect hospitals.

## IV.     Events Leading to the Commencement of these Chapter 11 Cases

### A.     Operational Headwinds and Liquidity Challenges

53.     Prospect's journey began as a community hospital operator in Los Angeles,
California, focused on providing essential healthcare services to underserved populations.  The
Company's dedication and success led to significant growth, both organically and through
acquisitions, transforming it into a multi-billion-dollar healthcare system with operations spanning
multiple states.   These acquisitions, however, brought with them the added responsibility of

---

[16]     A copy of the Senate Report may be found at the following link: https://www.budget.senate.gov/ranking-
member/newsroom/press/private-equity-in-health-care-shown-to-harm-patients-degrade-care-and-drive-
hospital-closures.

managing pension plans.  Prospect's three pension plans and three multi-employee pension plans
became a significant factor in Prospect's financial challenges amid the COVID-19 pandemic, the
rising costs of providing essential healthcare services (resulting from high rates of inflation, supply
issues, and increasing labor costs), and the unique challenges of serving economically
disadvantaged populations.

*vi) COVID-19*

54.    The COVID-19 pandemic has had lasting impacts on Prospect's businesses and
operations.  As a healthcare organization committed to operating as safety net hospitals serving
underserved communities, the Company has experienced unprecedented strain on its resources,
with dire financial consequences.  *First*, the pandemic led to higher expenses in all areas.  The
Company's hospitals faced rising costs for labor, drugs, purchased services, personal protective
equipment, and other medical supplies needed to care for patients.  Further, treating COVID-19
patients, especially those with severe conditions, significantly increased care costs.  Longer lengths
of stay and the need for specialized equipment further strained already tight financial resources.
*Second*, the pandemic also disrupted Prospect's normal operations.  Elective procedures were
postponed, outpatient visits declined, and overall patient volumes decreased.  While outpatient
visits are gradually recovering, they remain depressed compared to pre-pandemic levels.  This
reduction in volume directly impacted the Company's revenue.  *Third*, Prospect's patient
population includes a payer mix skewed towards low-income households.  These individuals often
rely on government-sponsored insurance programs or have limited ability to pay out-of-pocket.
The COVID-19 pandemic exacerbated the existing disparities in patient populations.  *Finally*,
while the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act provided some
relief, it was not sufficient to offset Prospect's losses resulting from the pandemic.

### vii) Inflation

55.     Increased costs due to inflation further exacerbated Prospect's financial challenges. Prospect has experienced significant increases in all areas of expenses related to labor, drugs, and supplies.  Driving the increase in labor expenses has been an increased reliance on contract staff, especially contract nurses, who are integral members of Prospect's clinical team.  Contract staff agencies have significantly increased the rates billed to Prospect's hospitals.  During the height of the COVID-19 pandemic, hourly billing rates for contract employees increased over 200% compared to pre-pandemic levels.  Drug and medical supply expenses also increased dramatically, with drug expenses increasing 30.5% per adjusted patient basis compared to pre-pandemic levels, and medical supply expenses increasing 33.7% through the end of March 2024 per adjusted patient basis compared to pre-pandemic levels.  Despite rising costs, Prospect's level of reimbursement has failed to meet inflation rates.  The majority of Prospect's patients are covered by Medicare and Medicaid programs, while Prospect also serves a substantial number of uninsured patients. Medicare and Medicaid rate increases for Prospect's hospitals have lagged behind inflation rates. Further, because Prospect does not exercise any market power within the private insurance sector, the Company has been unable to secure adequate increases in its private payer insurance rates.

### viii)     Pension Plans

56.     The Company assumed three single employer pension plans from distressed hospitals in connection with its strategic hospital acquisitions:

- As part of the Eastern Connecticut Health Network acquisition in October 2016, Prospect assumed the Eastern Connecticut Health Network, Inc. Employees Retirement Plan.

- As part of the Greater Waterbury Health Network acquisition in October 2016, Prospect assumed the Waterbury Hospital Cash Balance Retirement Plan.

- As part of the Crozer Keystone Health System acquisition in July 2016, Prospect assumed the Crozer-Keystone Health System Employees Retirement Plan. On the date of the acquisition, Prospect contributed approximately $100 million to this plan.

57.     Due to Prospect's severe liquidity constraints, all three pension plans are currently underfunded, with an estimated underfunding liability of approximately $312 million as of November 30, 2024, in the aggregate. The Company was required to make minimum contribution payments to its three pension plans for the 2023 plan year by September 15, 2024, but was unable to do so. These missed contribution payments were in amounts sufficient to trigger statutory liens. The amount subject to the statutory liens increased to approximately $24 million in the aggregate when Prospect's October 15, 2024, quarterly contributions were due and missed.

58.     On September 17, 2024, the PBGC perfected the statutory liens via state and local filings on 61 Prospect entities in California, Texas, Connecticut, Delaware, Vermont, and Rhode Island.

### ix) CARES Act

59.     As of September 30, 2024, the Company had approximately $32.3 million of outstanding liabilities arising under the CARES Act. After taking into consideration additional accrued late payment penalties and interest fees, such liabilities are currently estimated at over $33 million enterprise-wide.

### x) Cybersecurity Attack

60.     In August 2023, Prospect suffered a sophisticated cybersecurity attack that compromised its IT systems and sensitive data. The attack resulted in the disruption of operations, data loss, and reputational damage. Prospect incurred significant costs in responding to the attack and implementing additional security measures. The cyberattack also caused a reduction in patient volume and resulted in lost and delayed collections for services and receivables. While Prospect

had insurance coverage, it proved to be insufficient to fully cover the losses incurred and the potential costs of pending litigation.

### B.    Prepetition Initiatives

61.    Prospect has undertaken a number of initiatives in an effort to improve operating efficiency, performance, streamline costs, and improve its overall balance sheet profile, including operational turnaround strategies for its hospitals, the divestiture of hospitals and medical groups, and other out of court restructuring initiatives.

62.    ***Hospital Operational Strategies***.    Recognizing the need for operational turnarounds, Prospect retained Alvarez & Marsal Healthcare Industry Group, LLC to implement drastic reforms, in particular at their East Coast hospitals.  As a result, Prospect ultimately implemented several mitigation strategies, including cost-cutting measures and service line optimization, across its hospitals in California, Rhode Island, Pennsylvania, and Connecticut.  In California, Prospect devised effective operational plans and efficiencies that revitalized the California hospitals' financial health, even in the face of rising labor and other costs.

63.    Despite Prospect's concerted efforts and success in California, the Company was unable to achieve overall financial stability, as hospitals outside of California continued to incur unsustainable losses.  Lingering effects of the COVID-19 pandemic and inflation, reimbursement limitations, and shifting patient demographics posed formidable obstacles.  This continued deterioration suggested that Prospect was no longer in a sufficient financial position to stabilize its East Coast hospital.  Critical to this decision was evaluating the possibility of reducing or eliminating certain hospital services.  The potential consequences of shrinking or eliminating services, however, were not taken lightly.  While such actions may have offered short-term financial relief, they could have had a devastating impact on the populations and communities these hospitals serve.

64.     ***2023 Transaction***.  On May 23, 2023, certain Prospect affiliates effectuated the 2023 Transaction in connection with Centerbridge, Blue Torch, and MPT.  The 2023 Transaction had two principal impacts.  *First*, Centerbridge and Blue Torch infused $375 million of new capital into PHP Holdings, allowing PHP Holdings to satisfy its then-existing ABL obligations in the amount of approximately $200 million.  *Second*, it effectively created the corporate structure that is today referred to as "PhysicianCo."  PhysicianCo, or the non-Debtor entities at PHP Holdings and its subsidiaries, is made up of, among other things: (a) Prospect Health System, which includes Prospect Health Plan, its California licensed health care service plan, (b) Prospect Medical Groups, made up of medical groups in California, Texas, Arizona and Rhode Island,[17] (c) Prospect Medical Systems, a management service organization, (d) RightRx, a pharmacy, and (e) Alta Newport Hospital (d/b/a Foothill Regional Medical Center), a fully accredited acute care hospital with 177 licensed hospital beds.

65.     In exchange for the reduction of approximately $646 million in obligations owed by a number of Prospect entities to MPT, MPT received senior preferred units in PHP Holdings representing a 49% ownership interest, and a convertible promissory note, which would convert into more senior preferred units of PHP Holdings.  PMH holds the remaining 51% ownership interest in PHP Holdings.

66.     ***Strategic Divestitures***.  Consequently, Prospect embarked on a strategic divestiture of subsidiaries, including (a) an asset and equity sale of the PhysicianCo to Astrana Health, Inc. ("Astrana" and, such sale transaction, the "Astrana Sale") and (b) the going-concern sale of its hospitals in New Jersey, Texas, Pennsylvania, Connecticut, and Rhode Island.

---

[17]     The Rhode Island PhysicianCo entities are part of the Debtors' estates but being sold as part of PhysicianCo transaction.

67.     Although significant headway has been made on all prepetition sale transactions, regulatory delays and concerns regarding the Debtors' balance sheet and liabilities remain significant obstacles for the unconsummated sales.

*i)    The Astrana Sale*

68.     After months of extensive arm's-length negotiations, PHP Holdings and certain of its affiliates, as sellers, and Astrana, as buyer, entered into that certain Asset and Equity Purchase Agreement, dated as of November 8, 2024 (the "Astrana Purchase Agreement"), for the sale of, among other things:  a California licensed health care service plan; medical groups in California, Texas, Arizona, and Rhode Island; a management service organization; a pharmacy; and Alta Newport Hospital (d/b/a Foothill Regional Medical Center), a fully accredited acute care hospital with 177 licensed beds (the "Astrana Sale").  Subject to satisfaction of the closing conditions under the Astrana Purchase Agreement, Astrana plans to acquire these businesses and assets for a purchase price of $745 million, subject to certain closing adjustments.

69.     Although PhysicianCo is being sold as its own business, there remains certain operational interaction between PhysicianCo and HospitalCo.  For example, PMH sponsors PhysicianCo employees' benefits plans, and certain PMH employees are party to transaction bonus agreements or similar agreements that trigger upon a change of control at PhysicianCo.  There are also a number of third-party agreements with PMH and PHP Holdings or its subsidiaries as counterparties, and PMH provides PHP Holdings with (a) the benefit of certain services and products under a number of enterprise agreements and various third-party vendor agreements (e.g., equipment, services, medical supplies, and staffing agencies) and (b) administrative and support services under a support services agreement.  PMH is also the policyholder of certain insurance policies extended to PhysicianCo.  FRMC, which was conveyed to a newly formed subsidiary of

PHP Holdings in connection with the 2023 Transaction, also uses its revenue to pay certain costs under its existing management services agreement with certain HospitalCo entities.

70.     The Astrana Sale is currently expected to close in June 2025, after the satisfaction of customary regulatory approvals from a variety of governmental and regulatory agencies including the California Department of Public Health and the Rhode Island Executive Office of Health and Human Services.

### ii) *Texas and New Jersey*

71.     As a result of mounting losses in Texas, Prospect shut down its hospitals in San Antonio, Texas, in 2019.  Prospect later divested its Texas real estate in 2020.

72.     In October 2021, Prospect OldCo NJ, Inc. (f/k/a Prospect EOGH, Inc.) sold the East Orange General Hospital in East Orange, New Jersey, to EOH Acquisition Group, LLC.

### iii) *Pennsylvania*

73.     Prospect engaged in a fulsome marketing process for its Pennsylvania hospitals. Although it received an executed letter of intent with a potential buyer, the buyer later terminated. Prospect engaged in an additional marketing process after the original buyer terminated, which resulted in one potential viable purchaser with many conditions, including state approval.  Those conditions were not met.  Facing an imminent liquidity shortfall, Prospect attempted to transition Delaware County Memorial Hospital to meet community needs by providing behavioral health services.  However, the Foundation filed suit and the state would not issue the necessary licenses for the transition.  In addition, Prospect placed Springfield Hospital in suspension for all in-patient services.

74.     In response to these operational changes to the two hospitals, and coupled with operational challenges in running the remaining hospitals, in October 2024, the Pennsylvania Attorney General filed a complaint against certain of the Debtors and their affiliates.

75.     Prospect is continuing to market its Pennsylvania entities.  It is also in negotiations with the Commonwealth of Pennsylvania regarding a consensual transfer of its operations.

*iv)  Connecticut*

76.     On October 5, 2022, PMH and certain of its Connecticut affiliates, as sellers, and Yale New Haven Health Services Corporation ("Yale"), as buyer, entered into that certain Asset Purchase Agreement (the "Yale Purchase Agreement") for the sale of (i) Prospect's three Connecticut-based hospitals and their related medical facilities (the "Yale Sale") in exchange for $435 million in cash, subject to certain adjustments.

77.     However, and as described more fully below, Yale breached the agreement, failed to close, and subsequently filed a lawsuit against PMH and certain of its Connecticut affiliates in May 2024 to be relieved of its obligation to acquire the Connecticut hospitals, which Prospect had been relying on to strengthen its financial position.[18]  As a result of the delayed closing, Prospect continues to experience operational losses in Connecticut, and the ensuing litigation with Yale has become an additional strain on resources, requiring significant time and expense to respond to Yale's allegations.

78.     I understand that Prospect and Yale remain in negotiations regarding these issues.

*v)  Rhode Island*

79.     On November 18, 2022, PMH and certain of its affiliates, as sellers, and Centurion Foundation, Inc. ("Centurion"), as purchaser, entered into that certain Asset Purchase Agreement (the "Centurion Purchase Agreement") for the sale of two Rhode Island hospitals (the "Centurion Sale") in exchange for an effective purchase price of $80 million in cash, subject to certain adjustments.  This transaction is expected to close in Q1 2025; however, the Debtors' current

---

[18]     Complaint at 2, 6, *Prospect Med. Holdings, Inc. v. Yale New Haven Health Servs. Corp.*, No. HHD-CV24-5083574-S (Conn. Super. Ct. Sept. 11, 2024).

liquidity position threatens to jeopardize the timeline in which to close the Centurion Sale. Since signing the Centurion Purchase Agreement in 2022, Prospect and Centurion have been working diligently with the Rhode Island Attorney General and the Rhode Island Department of Health to satisfy regulatory requirements and prerequisites to closing the transaction. These agencies have enumerated multiple conditions that the sellers and purchaser must satisfy prior to closing the Centurion Sale, including increasing liquidity, hiring additional staff, and improving hospital conditions, all of which will require significant cash outlays that the sellers cannot currently afford.

80.    Centurion and Prospect are contemplating a private sale under Section 363 of the Bankruptcy Code. Prospect has been pursuing sale options for its Rhode Island assets for since Q4 of 2021 and Centurion is the only party to have emerged as a potential purchaser. It is my understanding that it is not likely that an alternative purchaser will emerge were the Debtors to pursue a public auction process. Centurion and Prospect are currently engaged in negotiations regarding new asset purchase agreement that contemplates a private sale under Section 363. Centurion has indicated that it is willing to pursue this method.

81.    ***Out-of-Court Efforts***. To allow operations to continue in the ordinary course while Prospect advanced their marketing and sale processes, beginning in August 2024 Prospect solicited offers for interim bridge financing from Centerbridge and MPT. After providing diligence and months of discussions, in November 2024, Centerbridge put forth a proposal to provide an aggregate of $20 million in interim financing. In December 2024, MPT refused to consent to the financing, thereby depriving the Company of a lifeline needed to bridge to a chapter 11 filing. As a result of MPT's rejection, Centerbridge was no longer interested in providing out-of-court financing. With Centerbridge unwilling to extend further capital to the Company out-of-court, the Company's only option was to seek protections of the Court, secure DIP financing, and advance

its sale transactions in chapter 11, including by utilizing the tools available under section 363 of the Bankruptcy Code.

### C.    DIP Facility

82.    As set forth more fully in the Debtors' DIP Motion[19] and the declaration in support thereof, prior to the Petition Date, the Debtors, with the assistance of their Advisors, negotiated and entered into a debtor-in-possession loan facility (the "DIP Facility"). These efforts culminated in JMB Capital Partners Lending, LLC's ("JMB Capital") commitment to providing critical new-money financing, ensuring that the Debtors will be able to continue the day-to-day operations of their facilities, sustain patient care, implement the anticipated sales of their hospital assets, and bring these Chapter 11 Cases to a value-maximizing conclusion. The DIP Facility consists of $100.0 million in the form of a non-amortizing, superpriority, senior-secured term loan facility, of which $29.0 million of the aggregate DIP Facility shall be made available upon the entry of the interim DIP Order (the "Interim DIP Order"), and the remaining $71.0 million upon the entry of the final DIP Order (the "Final DIP Order").

83.    I understand that in the weeks leading up the Petition Date, the Debtors engaged extensively with three of their largest secured lenders, Centerbridge, Blue Torch, and MPT, and that the Debtors communicated the status of these negotiations to JMB Capital during their discussions and highlighted the challenges the Debtors faced in securing lending on a consensual basis from the aforementioned parties.

---

[19]    The "DIP Motion" refers to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, filed contemporaneously herewith.

84.    The DIP Facility offers the Debtors an aggregate of $100 million in new-money
DIP financing, and allows the Debtors to continue providing life-saving, critical care to their
thousands of patients.  The Debtors intend to use the proposed new-money financing under the
DIP Facility to (a) ensure that patient, vendor, and employee obligations are met without
interruption, and (b) effectuate efficient and value-maximizing sales or other divestitures of their
hospitals, which are anticipated to generate additional value for the Debtors' estates and their
creditors.

**V.    First Day Motions**

85.    Contemporaneously herewith, the Debtors have filed a number of First Day
Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business
operations, facilitate the efficient administration of these Chapter 11 Cases, and execute a swift
and smooth restructuring.  I am familiar with the contents of each of the First Day Motions and
believe that the relief sought therein is necessary to enable the Debtors to operate during these
Chapter 11 Cases with minimal disruption or loss of productivity and value and best serves the
Debtors' estates and creditors' interests.  The First Day Motions include the following:

*Administrative Motions*

- "Claims Agent Retention Application":  *Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date;*

- "Creditor Matrix Motion":  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing The Debtors To File (A) a Consolidated Creditor Matrix and (B) a Consolidated List of the 30 Largest Unsecured Creditors; (II) Authorizing (A) the Debtors to Redact Certain Personally Identifiable Information, and (B) the Implementation of Procedures to Protect Confidential Patient Information; (III) Establishing a Complex Service List; (IV) Approving Form and Manner of Notice of Commencement; and (V) Granting Related Relief;*

- "Joint Administration Motion":  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief;* and

- "<u>SOAL/SOFA Motion</u>":  *Debtors' Emergency Motion for Entry of an Order (i) Extending Time to File (a) Schedules and Statements of Financial Affairs and (b) 2015.3 Reports, and (ii) Granting Related Relief.*

### *Operational Motions*

- "<u>Cash Management Motion</u>":  *Debtors' Emergency Motion for Entry of An Order (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and Maintain Their Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintaining Existing Business Forms and Books and Records; and (II) Granting Related Relief;*

- "<u>Contract-Lease Rejection and Rejection Procedure Motion</u>":  *Debtors' Motion For Entry Of An Order (I) Authorizing Rejection Of Certain Executory Contracts And Unexpired Leases On Nonresidential Real Property, (II) Approving Procedures For Future Rejection Of Additional Executory Contracts And Unexpired Leases, And (III) Granting Related Relief Critical Vendor Motion;*

- "<u>Critical Vendor Motion</u>": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and (B) Lien Claimants, and (II) Granting Related Relief;*

- "<u>Insurance Motion</u>":  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain their Insurance Policies, Surety Bonds, and Letters of Credit, (B) Honor All Obligations Related Thereto, and (C) Amend, Renew, Supplement, Extend, or Replace Existing Coverage; (II) Modifying the Automatic Stay; and (III) Granting Related Relief;*

- "<u>Tax Motion</u>": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Taxes and Fees and (II) Granting Related Relief;*

- "<u>Utilities Motion</u>": *Debtors' Emergency Motion for Entry of an Order (i)(a) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies and (b) Establishing Procedures for Resolving Objections by Utility Companies; (ii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (iii) Granting Related Relief; and*

- "<u>Wages Motion</u>":  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Satisfy Prepetition Employee Compensation and Benefit Obligations and (B) Continue their Employee Programs Policies and Procedures in the Ordinary Course, and (II) Granting Related Relief.*

86.    I have consulted with my colleagues at the Company and the Debtors' Advisors regarding the relief requested in the First Day Motions and I understand each of the First Day

Motions and the relief requested therein.  To the best of my knowledge and belief, the factual

statements contained in each of the First Day Motions are true and accurate.  Where applicable, a

brief summary of the facts supporting the First Day Motions is set forth below.  To the extent any

contain additional facts, those facts are incorporated herein by reference.  Capitalized terms used

but not otherwise defined in this section of this Declaration shall have the meanings ascribed to

such terms in the relevant First Day Motions.

87.     The operational First Day Motions seek authority to, among other things, honor

employee-related wages and benefit obligations, ensure the continuation of the Debtors' cash

management system, pay certain critical vendor claims, and maintain other operations in the

ordinary course of business.  The operational First Day Motions request authority to pay certain

prepetition claims.  I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in

relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21

days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid

immediate and irreparable harm."  In light of this requirement, I understand that the Debtors have

narrowly tailored their requests for immediate authority to pay certain prepetition claims to those

circumstances where the failure to pay such claims would cause immediate and irreparable harm

to the Debtors and their estates.   Accordingly, I believe and am advised that emergency

consideration of such motions is warranted.

88.     I further believe that the relief requested in the First Day Motions is necessary, is

in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will

allow the Debtors to operate with minimal disruption and maximize value preservation during the

pendency of these Chapter 11 Cases.  Additionally, I believe that (1) the relief requested in each

operational First Day Motion is critical; (2) unless the relief is granted, the Debtors risk the

probability of harm, or, alternatively, loss of economic advantage to the estate which is disproportionate to the amount of the prepetition claim sought to be satisfied; and (3) there is no practical or legal alternative by which the Debtors can deal with the claimants sought to be paid other than by payment of the claim.

89.     Accordingly, for the reasons set forth herein and in each respective First Day Motion, I believe that the Court should grant the relief requested in the First Day Motions.

***Administrative Motions.***

**A.      Claims Retention Application**

90.     Pursuant to the Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date (the "Claims Agent Retention Application"),[20] the Debtors seek entry of an order authorizing the Debtors to employ and retain Omni Agent Solutions, Inc. ("Omni") as the claims, noticing, and solicitation agent (the "Claims, Noticing, and Solicitation Agent") in the Debtors' chapter 11 cases, effective as of the Petition Date (as defined therein), consistent with the terms of the Standard Services Agreement between Omni and the Debtors, dated as of January 2, 2025 (the "Retention Agreement").

91.     Although the Debtors have not yet filed their schedules of assets and liabilities and statements of financial affairs, the Debtors anticipate that there will be thousands of parties to be noticed and that many of these parties will filed claims.  In view of the number of anticipated parties and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the

---

[20]     Capitalized terms used in this section but not otherwise defined herein shall have the respective meanings ascribed to such terms in the applicable First Day Motion.

Debtors and/or the Office of the Clerk of the Bankruptcy Court, of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of the Debtors' estates and their creditors.   Accordingly, I believe the Claims Agent Retention Application should be granted.

### B.    Creditor Matrix Motion

92.    Pursuant to the Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing The Debtors To File (A) a Consolidated Creditor Matrix and (B) a Consolidated List of the 30 Largest Unsecured Creditors; (II) Authorizing (A) the Debtors to Redact Certain Personally Identifiable Information, and (B) the Implementation of Procedures to Protect Confidential Patient Information; (III) Establishing a Complex Service List; (IV) Approving Form and Manner of Notice of Commencement; and (V) Granting Related Relief (the "<u>Creditor Matrix Motion</u>"), the Debtors seek entry of an order (a) authorizing the Debtors to file (i) a consolidated list of creditors (the "<u>Consolidated Creditor Matrix</u>"), and (ii) a consolidated list of their thirty (30) largest general unsecured creditors (the "<u>Consolidated Top 30 Creditors List</u>"); (b) authorizing (i) the Debtors to redact certain personally identifiable information, and (ii) the implementation of procedures to protect confidential patient information; (c) establishing an official complex service list; (d) approving the form and manner of notice of commencement of these Chapter 11 Cases, including special noticing procedures for the Debtors' current and former patients; and (e) granting related relief.

93.    I am advised that Bankruptcy Rule 1007 requires each debtor to file a list containing names and addresses of all creditors, including individuals, as well as a separate list of creditors holding the largest unsecured claims against each debtor.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily redundant task because the Debtors' creditors may overlap.  Because the preparation

of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors. Further, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors. I believe the Consolidated Top 30 Creditors List, similar to the Consolidated Creditor Matrix, will help alleviate administrative burden, costs, and the possibility of duplicative service, and assist efforts to communicate with these creditors.

94.     I also believe cause exists to authorize the Debtors to redact the names, home addresses, email addresses, and any other personally identifiable information of individuals or any other natural person, to the extent applicable or required by law, from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Consolidated Creditor Matrix and the schedules and statements, because such information could be used to perpetrate identity theft or create other risks to the individuals' safety and welfare.

95.     The Debtors also request authorization to enact procedures (the "Patient Protection Procedures") to protect confidential information of current and former patients of the Debtors. Specifically, the Debtors request that the Debtors and/or Omni Agent Solutions, Inc. ("Omni"), the proposed claims and noticing agent in these Chapter 11 Cases, be allowed to maintain a list of current or former patients (the "Patients"), which will assign a unique identification number to each Patient. The Debtors will redact and/or omit any protected health information from any paper to be filed with the Court, and the unredacted versions of any paper filed under seal with the Court pursuant to the Patient Protection Procedures shall not be made available to any party and may not be filed on the public docket and shall remain under seal until further order of the Court. I believe the relief requested balances the need to maintain confidential patient information under the Health

38

Insurance Portability and Accountability Act of 1996 with the need for disclosure under the
Bankruptcy Code.

96.     Further, the Debtors anticipate there will be approximately 750,000 notice parties
in these Chapter 11 Cases.  The costs associated with photocopying and mailing routine pleadings
to all potential creditors going forward would be substantial and exceedingly burdensome,
especially because it is not necessary to apprise all creditors and parties-in-interest of routine
matters that do not affect their rights.  Accordingly, I believe it is appropriate for the Court to limit
notice in these Chapter 11 Cases such that the Debtors and all other parties-in-interest do not incur
needlessly large, recurring expenses in serving routine pleadings.  Thus, the Debtors request that
the Court establish certain notice procedures (the "Notice Procedures").  These Notice Procedures
include the Debtors proposing to establish an official complex service list (the "Complex Service
List"), and the Debtors further proposing that notice of any pleading, motion, application, notice,
brief, objection, response, affidavits, declaration, or other writings filed in the Chapter 11 Cases
(each a "Filing", collectively, the "Filings"), other than an event or deadline that must be served
on all creditors pursuant to Bankruptcy Rule 2002, be served only on (a) the parties on the Complex
Service List, (b) any party who has filed a notice of appearance and request for service of pleadings
but has not yet been added to the Complex Service List, and (c) any party whose interests the
specific Filing affects.  I believe the Notice Procedures are appropriate to reduce the cost and
expense of these cases to the Debtors' estates, while preserving parties-in-interests' rights to
notice.

97.     I further believe that cause exists to authorize the Debtors to serve Patients by
postcard—instead of traditional, long-form notice of commencement (the "Notice of
Commencement")—and to offer Patients the option of electing to instead receive notices by email

39

where they desire. Although I am told the Bankruptcy Rules generally require notices to be served on creditors at their addresses, they give significant latitude to bankruptcy courts for modifying the general rule. With over approximately 700,000 current and former Patients, not only are postcards the most efficient and cost-effective manner by which service of all interested parties can be completed, it is also the most likely to facilitate responses. In addition, I believe this method of service will help alleviate administrative burdens and costs on the Debtors' estates.

98.     Finally, I am advised that, in compliance with the requirements of Bankruptcy Rule 2002(a), the Debtors, through Omni, propose to serve the Notice of Commencement on all parties entitled to such notice, and to advise them of the meeting of creditors pursuant to Bankruptcy Code section 341. I believe service of a single Notice of Commencement will not only avoid confusion among creditors but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties entitled to receive such notice under Bankruptcy Rule 2002. Further, the Debtors intend to file the Notice of Commencement in a form fit for publication.

99.     Accordingly, based on the foregoing, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

### C.      Joint Administration Motion

100.    Pursuant to the Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief filed contemporaneously herewith (the "Joint Administration Motion"), the Debtors request entry to an order directing consolidation of these Chapter 11 Cases for procedural purposes only. I understand that the Debtors are all affiliates of one another because, among other reasons, Prospect Medical Holdings, Inc. directly or indirectly owns or controls 20% or more of the outstanding voting

securities of each Debtor. Accordingly, I believe that joint administration is appropriate and authorized by the Bankruptcy Code and the Bankruptcy Rules.

101.    Moreover, I believe joint administration of the Debtors' Chapter 11 Cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. I believe that the United States Trustee for the Northern District of Texas and other parties in interest would similarly benefit from joint administration of these cases because it would spare them the time and effort of reviewing duplicative pleadings and papers.

102.    I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes and the Debtors do not seek substantive consolidation of their estates. As such, each creditor will continue to hold its claim against a particular Debtor's estate after joint administration is approved.

103.    Accordingly, based on the foregoing, I believe that joint administration of these Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be approved.

### D.    SOAL/SOFA Motion

104.    Pursuant to the Debtors' _Emergency_ Motion for Entry of an Order (i) Extending Time to File (a) Schedules and Statements of Financial Affairs and (b) 2015.3 Reports, and (ii) Granting Related Relief (the "SOAL/SOFA Motion"), the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file (i) their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") to and

including March 13, 2025, 60 days from the Petition Date (as defined below), and (ii) their initial

reports of financial information with respect to entities in which the Debtors hold a controlling or

substantial interest as set forth in rule 2015.3 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules", and such reports, the "2015.3 Reports") to and including February 26, 2025,

45 days from the Petition Date, in each case without prejudice to the Debtors' right to request

additional extensions of such deadline; and (b) granting related relief.

106.    Given the ongoing operational demand on the Debtors' personnel on a day-to-day

basis, it will take substantial time for the Debtors to analyze and compile the information needed

to complete its Schedules and Statements and 2015.3 Reports.  Specifically, it would be unduly

burdensome on the Debtors to prepare and file the Schedules and Statements within fourteen (14)

days of the Petition Date because (a) there are other urgent demands upon the Debtors as a result

of the filing of these Chapter 11 Cases that will consume the time of key personnel; (b) the Debtors'

operations involve numerous contracts and other agreements and it will take time to compile and

review each of those documents; (c) the Debtors may have contingent, unliquidated, or disputed

claims that are difficult to quantify; and (d) the Debtors and their professionals need additional

time to evaluate the information comprising the Schedules and Statements and 2015.3 Reports.

106.    The Debtors, with the assistance of their professional Advisors, have been and will

continue working diligently and expeditiously to prepare the Schedules and Statements and 2015.3

Reports within the additional time requested.  An extension will not harm creditors or other parties

in interest because, even under the extended deadline, the Debtors will file the Schedules and

Statements and 2015.3 Reports in advance of any deadline for filing proofs of claim in these

Chapter 11 Cases.

107.    Accordingly, the Debtors request that the Court extend the Schedules Deadline to the date that is 60 days following the Petition Date, *i.e.*, through and including March 13, 2025, and the deadline for the Debtors to file their initial 2015.3 Reports to the date that is 45 days following the Petition Date, *i.e.*, through and including February 26, 2025, in each case without prejudice to the Debtors' rights to seek further extensions of such deadlines.  The Debtors also request that the Court authorize the further extension of either deadline without further motion by the Debtors, and without further order from the Court, upon written agreement between the Debtors and the U.S. Trustee (which written agreement may be by email) and upon notice of such agreed extension filed on the docket of these Chapter 11 Cases and served on the Notice Parties.

108.    I believe that the relief requested in the SOAL/SOFA Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.  Accordingly, I believe that the SOAL/SOFA Motion should be granted.

***Operational Motions.[21]***

### E.    Cash Management Motion

109.    Pursuant to the Debtors' <u>Emergency</u> Motion for Entry of An Order (I) Authorizing the Debtors to (A) Continue Their Existing Cash Management System and Maintain Their Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintaining Existing Business Forms and Books and Records; and (II) Granting Related Relief (the "<u>Cash Management Motion</u>"), the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to (i) continue to operate their existing cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto,

---

[21]    All undefined terms below have the definition ascribed to them in their respective motion.

(ii) continue intercompany transactions and funding substantially consistent with their historical practices, and (iii) maintain existing business forms and books and records in the ordinary course of business; and (b) granting related relief.

110.    The Debtors use a cash management system to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtors' business (the "Cash Management System").  The Debtors use the Cash Management System to collect and disburse cash generated by their businesses, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, forecast financial performance, and ensure cash availability and liquidity.  The Company's Cash Management System includes 194 bank accounts (collectively, the "Bank Accounts").  The Bank Accounts are maintained by the Debtors at eight financial institutions (collectively, the "Cash Management Banks").  The bulk of the Debtors' cash on-hand is comprised of proceeds from the Debtors' ongoing business operations.  As of the Petition Date, the Debtors have an aggregate amount of approximately $3.35 million in the Bank Accounts.  In sum, the Debtors use the Bank Accounts to organize and monitor cash flows across the Debtors' entities and to centralize procurement for general administrative and operating expenses.

111.    In addition, the Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (collectively, the "Bank Fees").  The Bank Fees primarily consist of service charges from the Cash Management Banks.  The Debtors incur approximately $180,000 per month, in the aggregate, in Bank Fees, though earnings credits offered by Cash Management Banks such as City National Bank offset a portion of the monthly Bank Fees.  As of the Petition Date, the Debtors owe the Cash Management Banks approximately

$102,000 in unpaid Bank Fees.  The Debtors seek authority to continue paying Bank Fees, including the prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practices.

112.    The Debtors also use corporate credit cards issued by Wright Express Inc. for ambulance fuel purchases (collectively, the "Corporate Gas Credit Cards").  The Corporate Gas Credit Cards are reimbursed by the Debtors.  As of the Petition Date, 246 employees hold the Corporate Gas Credit Cards.  On average, the Debtors incur approximately $30,000 per month on account of the Corporate Gas Credit Cards.  As of the Petition Date, the Debtors estimate that they owe approximately $26,000 on account of the Corporate Gas Credit Cards.  The Debtors seek authority to continue making payments on account of the Corporate Gas Credit Cards, including charges incurred prepetition, in the ordinary course on a postpetition basis, consistent with historical practices.

113.    Finally, in the ordinary course of operating the Cash Management System, and in connection with providing care to their patients, the Debtors routinely engage in intercompany transactions (collectively, the "Intercompany Transactions") with one another and with non-Debtor subsidiaries and affiliates (each, a "Non-Debtor Affiliate").    The Intercompany Transactions involve, among other things, the Debtors collecting receivables generated by their various healthcare facilities and other operations into the Master Account and Debtor Prospect Medical Holdings, Inc ("PMH") making disbursements on behalf of other Debtors for expenses incurred in the ordinary course of business, including payroll and vendor payments.  As a result of the Intercompany Transactions, there may be intercompany receivables and payables among the Debtors and due from or to Non-Debtor Affiliates (collectively, the "Intercompany Claims").  The Debtors currently track, and will continue to monitor and record during these Chapter 11 Cases,

all fund transfers in their Cash Management System and can account for all Intercompany Transactions at any point in time.

114.    The Intercompany Transactions are an essential component of the Debtors' operations, and they are crucial to the Debtors' ability to process payroll and payments to third-party vendors, provide enterprise-wide management and support services, and otherwise facility daily operations.  The Debtors would be unduly burdened, both financially and logistically, if required to halt Intercompany Transactions or otherwise make material changes to the Cash Management System.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors' estates, their creditors, and other stakeholders.

115.    I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' businesses.  Maintaining the current Cash Management System will facilitate the Debtors transition into chapter 11 by minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Requiring the Debtors to adopt a new, segmented cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  The Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' respective treasury departments.  I believe that any disruption of the Cash Management System could have a negative adverse effect on the Debtors' restructuring efforts.  Indeed, requiring the Debtors to adopt a new, segmented cash management system would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and

stakeholders, including patients at the Debtors' healthcare facilities. Accordingly, I believe the Cash Management Motion should be granted.

### F.    Contract-Lease Rejection and Rejections Procedure Motion

116.    Pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and Unexpired Leases On Nonresidential Real Property, (II) Approving Procedures For Future Rejection of Additional Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "<u>Contract-Lease Rejection and Rejection Procedures Motion</u>"), the Debtors seek entry of an order (i) authorizing the Debtors to reject certain unexpired leases, effective as of the Petition Date; (ii) approving procedures for future rejection of additional executory contracts and unexpired leases; and (iii) granting related relief.

117.    In connection with these Chapter 11 Cases, the Debtors are undertaking an analysis of certain of their executory contracts and unexpired leases with respect to their medical and other general operations. As a result of this analysis, the Debtors determined, in their business judgment, that certain Leases relating to the Debtors' business activities are unnecessary and burdensome to the Debtors' estates and should be rejected as of the Petition Date. The Debtors, with the assistance of their Advisors, intend to continue examining their executory contracts and unexpired leases, and, as such, may determine, in their business judgment, that additional executory contracts and unexpired leases should be rejected in the future.

118.    I believe that rejection of the Leases is well within the Debtors' business judgment and is in the best interest of their estates. The Premises related to the Leases are currently vacant. Given the rents and current market conditions associated with the Leases, the overall losses the Debtors have been incurring in connection therewith, and the lack of strategic value provided by the Leases to the Debtors' go-forward strategy with respect to these Chapter 11 Cases (including any potential sale transactions related thereto), the Debtors have concluded, in consultation with

their Advisors, that the Leases are unlikely to generate significant value for their estates. Further, absent rejection, the Leases impose ongoing obligations on the Debtors and their estates that constitute an unnecessary drain on the Debtors' resources compared to any benefits associated therewith. Accordingly, to avoid incurring unnecessary administrative expense claims with respect to the Leases, the Debtors seek to reject the Leases, effective as of the Petition Date.

119.    For these reasons, I believe that the relief requested in the Lease-Contract Rejection and Rejection Procedures Motion reflects the Debtors' sound business judgment and the relief sought therein is in the best interests of the Debtors' estates and their creditors.

### G.    Critical Vendors Motion

120.    Pursuant to the Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and (B) Lien Claimants, and (II) Granting Related Relief (the "<u>Critical Vendor Motion</u>") the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business all prepetition amounts owing on account of certain claims in the chart below,[22] subject to the caps set forth in the interim order (the "<u>Interim Cap</u>") and the final order (the "<u>Final Cap</u>"); (b) confirming the administrative expense priority of certain Outstanding Purchase Orders (as defined below) and authorizing the payment of such obligations in the ordinary course of business; and (c) granting related relief.

121.    The Debtors' trade claimants are critical to the Debtors' ability to maintain safe and effective medical centers and provide high-quality health and wellness care to their patients. The medical centers run by the Debtors and their affiliated provider practices require a steady supply

---

[22]    Contemporaneously with the filing of this Motion, the Debtors have filed certain other "first day" motions seeking authority to satisfy certain prepetition claims. The relief sought in this Motion is not duplicative of any relief sought in any of the Debtors' other motions.

of goods and services to provide indispensable healthcare services and to maintain safe medical

centers. Any disruption in the provision of such goods and services would have far-reaching and

adverse economic and operational impacts on the Debtors' business and could harm the health and

well-being of the Debtors' patients.

122.    The Debtors engage service providers to, among other things repair medical

equipment, ship medical and pharmaceutical supplies, transport patients, cater meals, and manage

facilities. In many cases, these goods and services are highly specialized and, in some cases, may

give rise to mechanics', possessory, or other liens. In most cases, finding replacement vendors for

these goods and services on a timely basis would be extremely difficult and costly. Even where

alternative vendors exist, the time and costs associated with switching from one vendor to another

could irreparably harm the Debtors' business and ultimately harm the Debtors' patients.

123.    The following table summarizes the amounts of claims per category the Debtors

are requesting authority to pay pursuant to the Critical Vendors Motion.

| Category of Trade Claims | Amount Seeking Authority to Pay on Interim Basis | Amount Seeking Authority to Pay on Final Basis (Inclusive of Interim Amount) |
|---|---|---|
| Critical Vendor Claims | $7,500,000 | $34,500,000 |
| Lien Claims | $1,700,000 | $5,100,000 |
| **Total Trade Claims:** | $9,200,000 | $39,600,000 |

124.    With respect to the critical vendors, in the ordinary course of business, it is my

understanding that the Debtors incur obligations to certain vendors and/or their subsidiaries

(the "Critical Vendors") where (a) the Critical Vendors are the sole source supplier or service

provider; (b) the Critical Vendors provide goods or services necessary for the uninterrupted

operations of the Debtors' businesses; (c) the Critical Vendors provide services or supplies that are

so vital that even the briefest disruption would cause significant harm to the Debtors' operations;

and/or (d) the Debtors' inventory levels or service coverage are not sufficient to meet customer demands while an alternative vendor is located.

125.     I believe these Critical Vendors are key to the Debtors' operations given that they provide, among other things, vital shipping, production, and engineering services.  The Critical Vendors, moreover, are highly specialized vendors whose goods and services cannot be replaced quickly or without significant cost to the Debtors' estates, especially during this early, critical juncture in these Chapter 11 Cases.  Finally, it is my understanding that the Critical Vendors are also familiar with the Debtors' operations and needs, and as a result, replacing the Critical Vendors would have a swift and adverse effect on the Debtors' operations and likely harm the Debtors' relationships with their customers.  Accordingly, I believe the Critical Vendor Motion should be granted.

### H.     Customer Programs Motion

126.     Pursuant to the Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Refund Programs, and (B) Pay or Honor Related Prepetition Obligations, and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>"), the Debtors seek entry of an interim order and final order (a) authorizing, but not directing, the Debtors to, in the ordinary course of business and consistent with prior practice, (i) maintain and administer their prepetition refunds programs, and (ii) pay and otherwise honor certain prepetition obligations related thereto, and (b) granting related relief, including scheduling a hearing to consider approval of the Customer Programs Motion on a final basis.

127.     The refund recipients consist of patients, healthcare insurers, as well as Medicare and Medicaid, all of whom are vital to the Debtors' business.  If the relationships established by the Debtors with their refund recipients are harmed by the Debtor's failure to provide reimbursement for overpayments or pursuant to negotiated contractual arrangements, the Debtors

could suffer serious reputational consequences.  Without functional relationships with their patients, healthcare insurers, as well as Medicare and Medicaid, the Debtors have no business. Further, the Debtors may lose the trust of such refund recipients and new and existing refund recipients alike may be unwilling to engage with the Debtors going forward.  If that were to occur, the negative impact on the Debtors' business, their estates, and creditors would be significant and potentially irreversible.  It is therefore necessary for the successful reorganization of the Debtors that they be permitted to honor the refund programs.

128.    I believe that the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

## I.    Insurance Motion

129.    Pursuant to the Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain their Insurance Policies, Surety Bonds, and Letters of Credit, (B) Honor All Obligations Related Thereto, and (C) Amend, Renew, Supplement, Extend, or Replace Existing Coverage; (II) Modifying the Automatic Stay; and (III) Granting Related Relief  (the "<u>Insurance Motion</u>"), the Debtors seek entry of an order (a) authorizing the Debtors to (i) maintain coverage under the Insurance Policies, Surety Bonds, and Letters of Credit, (ii) honor all obligations related thereto, and (iii) amend, renew, supplement, extend, or replace existing coverage; (b) modifying the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Programs; and (c) granting related relief.

130.    The Debtors maintain approximately seventy-two (72) Insurance Policies that are administered by various third-party Insurance Carriers.  The Insurance Policies provide the Debtors with coverage for, among other things, director and officer liability, property liability,

employment practice liability, cyber liability, crime liability, fiduciary liability, errors and omissions liability, professional liability, automobile liability, aviation liability, pollution liability, workers' compensation liability, and general liability.  In addition, the Insurance Policies include several layers of excess liability coverage.  A detailed list of the Insurance Policies currently maintained by the Debtors is attached to the Insurance Motion as <u>Exhibit B</u>.

131.    The Debtors incur various obligations in connection with their Insurance Policies, including obligations in respect of Insurance Premiums, Premium Financing Agreements, Deductibles and SIRs, the Workers' Compensation Program, the Captive Insurer Program, and Insurance Fees owed to Insurance Brokers and Managers and third-party administrators.

132.    The Debtors are required by certain statutes, rules, and regulations to provide Surety Bonds for the benefit of certain third parties to secure certain of the Debtors' payment or performance obligations.  These obligations relate to, among other things, workers' compensation, Medicare/Medicaid programs, leases, permits and insurance.  A schedule of the Surety Bonds currently maintained by the Debtors is attached to the Insurance Motion as <u>Exhibit C</u>.

133.    In addition, the Debtors obtain various letters of credit for the benefit of third parties to support their insurance-related obligations.  The Debtors' Letters of Credit include, but are not limited to, those attached to the Insurance Motion as <u>Exhibit D</u>.  The Debtors' reimbursement obligations to the Letter of Credit issuer for the Self-Insured Workers' Compensation Program are supported by cash collateral, allowing the Debtors to honor their obligations to the issuer without prejudicing unsecured creditors.

134.    Continuation and renewal of the Insurance Policies and entry into new Insurance Policies is essential to preserving the value of the Debtors' businesses, properties, and assets.  In many cases, coverage provided by the Insurance Policies is also required by the applicable

regulations, laws, customer contracts, and other arrangements that govern the Debtors' operations, as well as the Bankruptcy Code and the requirements of the Office of the U.S. Trustee.

135.    Certain states have laws and regulations requiring physicians to obtain medical malpractice insurance in order to practice.  Thus, if the Captive Insurer Program were to terminate, the Debtors and their physicians would have to seek coverage elsewhere, potentially at much higher costs.  Further, should the Debtors' physicians provide care while uninsured, they would be left exposed to potential personal liability from medical malpractice claims, and they would be acting in violation of state laws and regulations.  As such, physicians who rely on coverage from the Captive Insurer Program may refuse to continue to work for the Debtors and could seek employment elsewhere.   Accordingly, the Debtors' operations would experience significant disruption to the detriment of patients if the Debtors were not allowed to continue the Captive Insurer Program.

136.    Moreover, the Debtors could be exposed to significant liability if the Insurance Policies were allowed to lapse or terminate as they would not have insurance coverage to protect against certain risks and liabilities.  Such exposure could detrimentally impact the success of these Chapter 11 Cases—in particular, if an uninsured loss were to occur.  In addition, failure to timely pay the outstanding Insurance Premium could expose the Debtors to potential penalties or termination of their Insurance Policies.   Further, if the Debtors fail to pay their Insurance Premiums, it may result in carriers refusing to renew Insurance Policies or seeking to charge higher rates for policy renewals.

137.    Further, all of the jurisdictions in which the Debtors operate their business (other than Texas) require the Debtors to maintain workers' compensation coverage in accordance with applicable law.  If the Debtors fail to maintain the workers' compensation coverage for certain

states, they may be prohibited from operating in those states. Also, if eligible workers'
compensation claimants do not receive timely payments for prepetition employment-related
injuries, it would negatively impact the financial well-being and morale of those claimants and, in
turn, the Debtors' entire employee base, potentially resulting in employee departures.
Accordingly, maintaining the Workers' Compensation Program and satisfying all workers'
compensation claims in connection therewith are crucial to the Debtors' continued operations and
the success of the Debtors' ongoing chapter 11 process.

138.    Similarly, to continue their business operations during these Chapter 11 Cases, the
Debtors must be able to provide financial assurances to certain of the Insurance Carriers and
regulatory agencies that oversee certain aspects of the Debtors' business. This requires the Debtors
to maintain their existing Surety Bonds and Letters of Credit in the ordinary course of business,
including the payment of premiums and fees as they come due, renewing or potentially acquiring
additional bonding capacity or letters of credit, as needed, and executing other agreements, as
needed, in connection with the Surety Bonds and Letters of Credit.

139.    Accordingly, based on the foregoing, the relief requested in the Insurance Motion
is in the best interests of the Debtors, their estates, and all parties in interest and should be
approved.

**J.    Tax Motion**

140.    Pursuant to the Debtors' Emergency Motion for Entry of Interim and Final Orders
(I) Authorizing the Debtor to Pay Prepetition Taxes and Fees and (II) Granting Related Relief (the
"Taxes Motion"), the Debtors seek entry of interim and final orders (a) authorizing, but not
directing, the Debtors to remit and pay (or use tax credits to offset) prepetition Taxes and Fees (as
defined below) to various federal, state, local, regulatory, and governmental authorities
(collectively, the "Taxing Authorities" as further defined in the Taxes Motion) in the ordinary

course of business that are payable or become payable during these Chapter 11 Cases; and
(b) granting related relief, including scheduling a hearing to consider approval of the Motion on a
final basis.

141.    In the ordinary course of their business, the Debtors bill, collect, incur, remit, and/or
pay a variety of sales taxes, use taxes, commercial taxes, income taxes, franchise taxes, property
taxes, business-related taxes and charges, regulatory and other taxes and fees, including, but not
limited to, healthcare provider taxes and environmental fees, as well as interest, penalties, fees,
and assessments on account of taxes and related obligations (collectively, the "Taxes and Fees").
The Debtors generally pay the Taxes and Fees to the Taxing Authorities through checks and
electronic funds transfers that are processed through their banks on a periodic basis—monthly,
quarterly, or annually—as applicable, depending on their nature and incurrence.   In certain
instances, the Debtors negotiate with the Taxing Authorities to determine the amount of Taxes and
Fees due and owing.

142.    The taxes and regulatory assessments the Debtors typically incur generally fall into
the following categories: Sales and Use Taxes, Income and Related Taxes, Property Taxes,
Regulatory and Other Taxes and Fees, and Healthcare Provider Taxes and Fees (as further defined
in the Taxes Motion).   The following table outlines the various categories and approximate
amounts of the Taxes and Fees the Debtors are seeking authority to pay pursuant to this Motion:

| Category of Taxes and Fees | Approx. Amount Seeking Authority to Pay on Interim Basis | Approx. Amount Seeking Authority to Pay on Final Basis (Inclusive of Interim Amounts) |
|---|---|---|
| Sales and Use Taxes | $300,000 | $400,000 |
| Income and Related Taxes | $0 | $23.82 million |
| Property Taxes | $6.78 million | $35.27 million |
| Regulatory and Other Taxes and Fees | $660,000 | $930,000 |
| Healthcare Provider Taxes and Fees | $0 | $24.48 million |
| **Total:** | $7.74 million | $84.90 million |

143.     As of the Petition Date, the Debtors estimate that approximately $84.90 million in Taxes and Fees are accrued and unpaid, $7.74 million of which will become due and payable to the Taxing Authorities within the first 30 days after the Petition Date.[23]

144.     I believe the continued payment of the prepetition Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates.  If such obligations are not timely paid, the Debtors' directors and officers may be subject to lawsuits or prosecution, the Debtors would face additional tax liability through subsequent interest charges, fees, and penalties, the Debtors' business operations may be suspended, and the Debtors will be required to expend time and money to resolve these issues.  Accordingly, I believe the Taxes Motion should be granted.

### K.     Utilities Motion

145.     Pursuant to the Motion Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies And (B) Establishing Procedures for Resolving Objections by Utility Companies; (II) Prohibiting

---

[23]     The Debtors are not seeking to accelerate payment on account of any Taxes and Fees. Subject to the Court's approval, the Debtors will only pay the Taxes and Fees as they become due and owing during these Chapter 11 Cases.

Utility Companies From Altering, Refusing, or Discontinuing Service; and (III) Granting Related Relief (the "Utilities Motion"), the Debtors seek entry of an order (a)(i) approving Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined below) and (ii) establishing procedures for resolving objections by the Utility Companies; (b) prohibiting the Utility Companies from altering, refusing, or discontinuing service; and (c) granting related relief.

146.    To operate their business and manage their properties in the ordinary course of business, the Debtors obtain telecommunications, internet service provider, electric, waste (including medical waste), water, sewer, oil, natural gas, fire prevention, and other utility services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies"). The relief requested herein is with respect to all Utility Companies providing Utility Services to the Debtors.[24]

147.    Based on their monthly average for the twelve (12) months prior to the Petition Date, the Debtors estimate that, on average, they spend approximately $4.0 million per month on Utility Services.

148.    Preserving uninterrupted Utility Services is essential to the Debtors' ongoing operations and to ensuring continued patient care. The Debtors use Utility Services at their patient-facing medical centers, corporate offices, and other locations. In the course of providing healthcare and wellness services to their patients, the Debtors rely on Utility Companies to power complex medical equipment, administer patient procedures, ensure access to, and the security of, patient health information, issue prescriptions, and safely dispose of medical waste. Any interruption in

---

[24] For certain locations in which the Debtors operate, Utility Services are billed directly to the Debtors' landlord and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements. The Utility Companies with respect to these services are not listed in Exhibit B. For the avoidance of doubt, however, the relief requested herein is requested with respect to all Utility Companies providing utility services to the Debtors, including all Utility Providers paid directly by the Debtors' landlords.

Utility Services, no matter how brief, would not only compromise the Debtors' business, but, more importantly, would endanger patient safety. Such a result could harm the Debtors' ability to remain in compliance with various government regulations and honor contractual commitments to private health plan counterparties, ultimately frustrating creditor recoveries and imperiling the trajectory of these Chapter 11 Cases. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, which would negatively impact the Debtors' restructuring efforts to the detriment of all parties in interest. Accordingly, it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

149.    The Debtors intend to satisfy undisputed, postpetition obligations owed to the Utility Companies, and to their landlords who make such payments directly to the Utility Companies, in the ordinary course of business. The Debtors believe that cash on hand, cash flow from operations, and their proposed use of cash collateral and debtor-in-possession financing will provide the Debtors with sufficient liquidity to pay the accrued Utility Service obligations that become due postpetition, in accordance with the Debtors' prepetition practices.

150.    To provide the Utility Companies with adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose depositing into a segregated account for the benefit of the Utility Companies (the "Adequate Assurance Account") cash in an amount equal to two (2) weeks' cost of Utility Services, less any existing deposits, surety bonds, or letters of credit and excluding utility services billed directly to the Debtors' landlords. The cost of Utility Services is calculated using the historical average weekly cost of such services incurred for the twelve (12) months preceding the Petition Date (the "Adequate Assurance Deposit"). Based on the foregoing,

the Debtors estimate the total amount of the Adequate Assurance Deposit will be approximately
$1,947,277.

151.    The Adequate Assurance Deposit may be adjusted by the Debtors without further
order from the Court if the Debtors terminate any of the Utility Services provided by a Utility
Company, make alternative arrangements with a Utility Company for adequate assurance of
payment, determine that an entity listed on the Utility Service List is not a "utility" provider as
defined by section 366 of the Bankruptcy Code, or supplement the Utility Service List to include
additional Utility Companies.

152.    The Debtors further request authority to cause the Adequate Assurance Deposit and
any funds held in the Adequate Assurance Account to be returned to the Debtors upon the effective
date of a chapter 11 plan if there are no outstanding disputes related to postpetition payment or
such other time as the Court may order.

153.    I believe that the Adequate Assurance Deposit, in conjunction with cash on hand,
cash flow from operations, and their proposed use of cash collateral and debtor-in-possession
financing, demonstrate the Debtors' ability to pay for future Utility Services in the ordinary course
of business (collectively the "Proposed Adequate Assurance"), constitutes sufficient adequate
assurance to the Utility Companies in satisfaction of section 366 of the Bankruptcy Code.
Accordingly, I believe the Utilities Motion should be granted.

**L.    Wages Motion**

154.    Pursuant to the Debtors' Emergency Motion for Entry of an Order (I) Authorizing
the Debtors to (A) Satisfy Prepetition Employee Compensation and Benefit Obligations and (B)
Continue their Employee Programs, Policies, and Procedures in the Ordinary Course, and (II)
Granting Related Relief (the "Wages Motion"), the Debtors are seeking authority to (a) pay and
remit any prepetition claims on a postpetition basis, as applicable, relating to certain Workforce

Obligations including related expenses, fees, and costs incident to the Workforce Obligations, and including amounts owed to third-party service providers, administrators, and tax authorities, and (b) maintain, continue to honor, and pay amounts related to or on account of the Workforce Obligations on a postpetition basis in the ordinary course of business, as such business practices, programs, policies, and procedures giving rise to the Workforce Obligations may be modified, supplemented, or discontinued from time to time in the ordinary course of business.  The monetary relief sought in the Wages Motion with respect to prepetition obligations is summarized in the following chart:

| Workforce Obligations[25] | Estimated Prepetition Amount Outstanding |
|---|---|
| **Employee Compensation Obligations** | |
| Wages | $48,500,000 |
| Reimbursement Obligations | $600,000 |
| Withholding Taxes and Obligations | $11,700,000 |
| Employer Payroll Taxes | $3,800,000 |
| Deductions | $3,500,000 |
| Deferred Employer Payroll Taxes | $31,900,000 |
| Payroll Services | $400,000 |
| Union Dues | $1,400,000 |
| Contractor Obligations | $15,200,000 |
| **Subtotal:** | **$117,000,000** |
| **Employee Benefit Obligations** | |
| Medical Plans | $10,900,000 |
| Dental Plans | $400,000 |
| Vision Plans | $0 |
| Life, AD&D, and Disability Insurance Plans | $1,400,000 |
| FSA Program | $400,000 |

---

[25]    The Debtors are not seeking authority pursuant to this Motion to pay any amount in excess of the statutory priority caps imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

| Workforce Obligations[25] | Estimated Prepetition Amount Outstanding |
|---|---|
| Wellness Care | $300,000 |
| Employee Leave Benefits | $51,400,000 |
| Retirement Benefits | $47,800,000 |
| Subtotal: | $112,600,000 |
| Total: | $229,600,000 |

155.     As described more fully in the Wages Motion, as of the Petition Date the Debtors' workforce is comprised of approximately 12,500 employees, of which approximately 9,200 employees are full time (the "Full Time Employees") and 3,300 are part time, Employees (the "Part Time Employees," together with the Full Time Employees, the "Employees"). The Debtors process payroll semi-monthly, with the majority of the Debtors' payroll made by direct deposit through electronic transfer of funds to the Employees' bank accounts or other electronic means. The Debtors must also satisfy certain reimbursement, payroll processing services, and tax withholding obligations, as applicable.  In the ordinary course of business, the Debtors must satisfy the Employee Benefit Obligations, which are available to all eligible employees who work the requisite hours per week for a given benefit or who otherwise satisfy the eligibility requirements for any of the Employee Benefit Obligations.

156.     The relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Failure to satisfy obligations related to Employee Compensation Obligations and Employee Benefit Obligations will jeopardize morale and likely result in the loss of valuable Employees, who are the lifeblood of the Debtors' operations, thereby hindering the Debtors' ability to meet their obligations and threatening the successful consummate of these Chapter 11 Cases for the benefit of the Debtors' stakeholders.

157.    I believe that: (1) it is critical that the Debtors maintain their workforce, which is the lifeblood of their operations and instrumental to the Debtors' ability to operate in the ordinary course and maximize value; (2) if the Debtors are not able to satisfy the prepetition Workforce Obligations, it is likely that the Debtors' workforce would suffer reduced productivity or seek alternative employment, imperiling the Debtors' ability to continue as a going concern; and (3) the Debtors would not be able to replace their Employees or doing so would be more costly than satisfying such claims.

## Conclusion

158.    The above describes the Company's business and capital structure, the factors leading up to and that precipitated the commencement of these Chapter 11 Cases, and the critical need for the Debtors to commence these Chapter 11 Cases.  The Debtors' ultimate goal in these Chapter 11 Cases is to stabilize their operations to ensure that they may continue to provide high-quality healthcare service to their patients and effectuates a sales process sale process to maximize value for all stakeholders in these Chapter 11 Cases.

[*Remainder of page left intentionally blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.

Date: January 13, 2025

/s/ *Paul Rundell*
_____

Paul Rundell
Chief Restructuring Officer